454 So.2d 1081 (1983)
BORDEN, INC.
v.
HOWARD TRUCKING COMPANY, INC. and Northwest Insurance Company.
Nos. 83-C-0203, 83-C-0238.
Supreme Court of Louisiana.
October 17, 1983.
On Rehearing June 28, 1984.
Dissenting Opinion June 29, 1984.
Rehearing Denied September 14, 1984.
*1082 Lawrence A. Durant, Durant, Pierce & Malone, Baton Rouge, for applicant in No. 83-C-0203 and respondents in No. 83-C-0238.
Leon E. Roy, Jr., Hugh E. McNeely, Roy, Forrest & Lopresto, New Iberia, for respondents in No. 83-C-0203 and applicant in No. 83-C-0238.
Eugene R. Groves, Taylor, Porter, Brooks & Phillips, Baton Rouge, P. Albert Bienvenu, Jr., Bienvenu, Foster, Ryan & O'Bannon, New Orleans, for respondents in both cases.
Dissenting Opinion of Justice Blanche June 29, 1984.
DIXON, Chief Justice.
Borden, Inc. manufactures methanol at its plant in Geismar, Louisiana on a twenty-four hours a day, seven days a week basis. Rather than halting production every time a minor problem develops with the equipment used in this process, these problems are noted and corrected during a "turn-around." A "turn-around" is a scheduled period for routine repairs and maintenance. Borden scheduled a "turn-around" for its methanol "B" plant to begin on October 26, 1976 and to end on October 30, 1976. As was its customary procedure, Borden contacted its repair contractor, Dresser Industries, Inc., and planned the routine maintenance of two compressors used in the manufacture of methanol. Dresser arranged with Howard Trucking Company, Inc. for the carriage of one of the compressors from Borden's plant to Dresser's repair and maintenance facility in Harahan, Louisiana.
While enroute to the Dresser facility, the Howard truck was involved in a one vehicle accident and overturned, killing the driver. Borden's compressor was damaged when it was thrown from the bed of the truck. In addition, the resumption of production was delayed at the Borden plant because of the additional repairs to the compressor necessitated by the accident.
On August 2, 1977 Borden filed suit against Howard and Northwest Insurance Company, Howard's comprehensive automobile, *1083 general and contractual liability insurer, seeking recovery for the cost of repairing the compressor and for the loss of production of methanol due to the delay in getting the compressor back into operation. Howard's cargo insurer, Antoy William Ames, an Underwriter at Lloyd's, London, was named as an additional defendant and Dresser was added as a party plaintiff on April 20, 1978.
The trial court rendered judgment against Howard and Ames[1] in the sum of $174,203.63, and dismissed all claims against Northwest.[2] The court of appeal reversed, finding coverage under Northwest's policy for the loss of production and under Ames' policy for the physical damage to the compressor. Borden, Inc. v. Howard Trucking Co., Inc., 425 So.2d 893 (La.App.1983).
At the outset we agree with the finding of the lower courts that Howard was at fault for the damage suffered by Borden based upon the negligence of Howard's employee. The Howard vehicle drove off the traveled roadway and turned over in a one vehicle accident.
When a party has been damaged by the conduct of another arising out of a contractual relationship, he may choose to recover under either tort or contract. Federal Insurance Co. v. Insurance Company of North America, 262 La. 509, 263 So.2d 871 (1972). Here Borden had contracted with Howard, through its agent Dresser, to transport the compressor from Geismar to Harahan. The damage to Borden's property arose out of the performance of this contract. The lower courts found that Borden's action lay in tort, and that Borden was entitled to recover all foreseeable damages flowing from the accident. We affirm this finding.
Borden argues that it is entitled to two separate items of property damage stemming from the accident. The first is for physical damage to the compressor itself. The second claim is for the loss of production resulting from the damage to the compressor. Borden maintains that its right to use its compressor in its plant, free from the interference of others, was in itself property, independent and separate from the compressor itself. Thus, Borden asserts that the loss of production due to the damaged compressor was itself an additional item of property damage.
The lower courts agreed that Borden was entitled to recover all of its damages, both for the compressor and for the loss of production. The primary issue in dispute is whether Howard or its insurance companies are to pay the damages to Borden.
Northwest, Howard's liability insurer, contends that it is not liable to Borden. The insurance company argues that there is no coverage for either type of property damage under the policy issued to Howard because of the exclusions in its policy. Northwest had issued a standard multifaceted liability policy to Howard. The policy contains three basic types of coverage: (a) comprehensive automobile liability insurance; (b) comprehensive general liability insurance; and (c) contractual liability insurance.
Each of these coverages contained a standard insuring clause with exceptions. Under the comprehensive automobile liability insurance coverage it was agreed that:[3]

*1084 "COVERAGE CBODILY INJURY LIABILITY
COVERAGE DPROPERTY DAMAGE LIABILITY
The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of
C. bodily injury or
D. property damage
to which this insurance applies, caused by an occurrence and arising out of the ownership, maintenance or use, including loading and unloading, of any automobile,...
. . . . .
Exclusions
This insurance does not apply:
. . . . .
(d) to property damage to
(1) property owned or being transported by the Insured, or
(2) property rented to or in the care, custody or control of the Insured, or as to which the Insured is for any purpose exercising physical control, other than property damage to a residence or private garage by a private passenger automobile covered by this insurance.
. . ."
Under the comprehensive general liability insurance coverage it was provided that:
"COVERAGE ABODILY INJURY LIABILITY
COVERAGE BPROPERTY DAMAGE LIABILITY
The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of
A. bodily injury or
B. property damage
to which this insurance applies, caused by an occurrence ...
. . . . .
Exclusions
This insurance does not apply:
. . . . .
(k) to property damage to
. . . . .
(3) property in the care, custody or control of the Insured or as to which the Insured is for any purpose exercising physical control;
. . . . .
(m) to loss of use of tangible property which has not been physically injured or destroyed resulting from
(1) a delay in or lack of performance by or on behalf of the Named Insured of any contract or agreement, or
(2) the failure of the Named Insured's products or work performed by or on behalf of the Named Insured to meet the level of performance, quality, fitness or durability warranted or represented by the Named Insured;
but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the Named Insured's products or work performed by or on behalf of the Named Insured after such products or work have been put to use by any person or organization other than an Insured;
. . ."
Finally, under the contractual liability insurance coverage, it was provided that:
"COVERAGE YYCONTRACTUAL BODILY INJURY LIABILITY
COVERAGE ZZCONTRACTUAL PROPERTY DAMAGE LIABILITY
The Company will pay on behalf of the Insured all sums which the Insured, by reason of contractual liability assumed by him under any written contract relating to the business of the Named Insured as stated in the declarations, shall become legally obligated to pay as damages because of
bodily injury or
property damage *1085 to which this insurance applies, caused by an occurrence, ...
. . . . .
Exclusions
This insurance does not apply:
. . . . .
(g) to property damage to
(3) property in the care, custody or control of the Insured or as to which the Insured is for any purpose exercising physical control;
. . . . .
(i) to loss of use of tangible property which has not been physically injured or destroyed resulting from
(1) a delay in or lack of performance by or on behalf of the Named Insured of any contract or agreement, or
(2) the failure of the Named Insured's products or work performed by or on behalf of the Named Insured to meet the level of performance, quality, fitness or durability warranted or represented by the Named Insured;
but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the Named Insured's products or work performed by or on behalf of the Named Insured after such products or work have been put to use by any person or organization other than an Insured;
. . ."
Howard does not argue that the above coverages extended to the actual physical damage to the compressor. That damage was clearly excluded under the Northwest policy for it was incurred while the property was "being transported" by Howard, and while the compressor was under the "care, custody or control" of Howard.
Howard claims that the physical damage to the compressor was covered under its cargo policy with Ames. Antoy Williams Ames had issued a policy of insurance to Howard covering damage to cargo which was in the custody or control of the insured. This policy specifically did not cover loss of use, loss resulting from delay in production or any other consequential or remote loss. The Ames Motor Cargo Liability Policy provides as follows:
"This policy covers the liability of the insured for loss or damage to lawful goods and merchandise while in the custody or control of the insured (and while in the custody of connecting carriers) in the ordinary course of transit within the contiguous states of the United States, The District of Columbia and Canada (except as provided elsewhere in this policy)
. . . . .
6. This policy does not insure the liability of the insured for:
. . . . .
c. Loss of market; delay; loss of use or any other remote or consequential loss;
. . ."
We agree with the lower courts that Ames is liable only for the physical damage to the compressor, less the deductible stated in the policy. The Ames policy is clear and unambiguous that loss of use and other consequential losses are excluded from coverage.
Howard insists that while the Ames policy does not provide coverage for loss or use of the compressor, the Northwest policy does provide this coverage. Even though the Northwest policy, unlike the Ames policy, does not afford coverage for physical damage to the compressor, Howard contends that the Northwest policy does provide coverage for loss of use of the compressor. Howard argues that the loss of production resulting from the inability of Borden to resume operations on schedule is a separate and distinct item of property damage from the physical damage to the compressor, and is not clearly excluded in the Northwest policy. In addition, Howard asserts that the exclusionary clauses in the Northwest policy are ambiguous and unclear, and so should be interpreted in favor of coverage.
Northwest, on the other hand, argues that its policy is sufficiently clear and excludes damages resulting from loss of use *1086 of the damaged compressor. Northwest reasons that since its policy clearly excludes coverage for the damaged property itself, it should be apparent that any consequential losses flowing from this physical damage are likewise excluded. Northwest declares that its policy accomplished the same goal as the Ames policy with respect to the exclusion of damages for loss of production directly attributed to the physical damage to the compressor.
The primary issue is whether the loss of use of the compressor is property damage in and of itself or whether it is merely included as a measure of damage resulting from the physical damage to the compressor. If the loss of use is independent property damage, regardless of whether the tangible property is covered by the policy, then the liability policy would include the loss of use unless an exclusion specifically applied. However, if the loss of use is simply an additional measure of damage flowing from the physical damage to the compressor, then the loss of use would not be covered by the policy unless the physical damage to the compressor was also covered.
To determine whether the loss of use of damaged physical property is viewed as property damage itself, regardless of whether the underlying tangible property is covered, it is necessary to examine the definition of "property damage" contained in the policy.
The policy defines the term as follows:
"`property damage' means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period." (Emphasis added).
The law is well settled that if there is any doubt or ambiguity as to the meaning of a provision in an insurance policy, it must be construed in favor of the insured and against the insurer. When the ambiguity relates to an exclusionary clause, the law requires that the contract be interpreted liberally in favor of coverage. The primary object of all insurance is to insure, and exclusionary clauses are strictly construed against the insurer. Insurance Company of North America v. Solari Parking, Inc., 370 So.2d 503 (La.1979); Credeur v. Luke, 368 So.2d 1030 (La.1979).
Based on the language of the policy we find that where injury or destruction of property is not covered by the policy, the resulting loss of use of that property is not covered unless otherwise stipulated. The loss of use of physically damaged tangible property is merely a measure of damage resulting from the property damage. Loss of use of physically damaged tangible property is not property damage in and of itself. It is dependent on the coverage afforded the damaged tangible property under the policy. Property damage is defined as the "physical injury to or destruction of tangible property ... including the loss of use thereof ... resulting therefrom ..." (Emphasis added).
We agree with the conclusion of the Supreme Court of South Carolina in Torrington v. Aetna Casualty & Surety Co., 264 S.C. 636, 216 S.E.2d 547, 550 (1975), that:
"... It is the only reasonable construction of the contract that damages arising from loss of use were excluded. [The insurance company] must pay only when there has been injury to or destruction of property for which it is liable. Since the injury to and/or destruction of property is not covered, the resulting loss of use is not covered. The provision for `including the loss of use thereof,' is merely a parenthetical phrase expressly providing for consequential damagaes when the insurer is otherwise liable on the underlying claim. The loss of use grew out of the injury and/or destruction, and since the injury and/or destruction were excluded, the loss of use was excluded as a necessary consequence."
For the reasons assigned, the judgment of the court of appeal is reversed, and the judgment of the trial court is reinstated. *1087 Defendants, Howard Trucking Company, Inc. and Antoy William Ames, an Underwriter at Lloyd's, London, are cast for costs.
WATSON, J., dissents being of the opinion that Borden is not entitled to consequential damages.

On Rehearing
CALOGERO, Justice.
We granted the rehearing applications of defendants Howard Trucking Company and Antoy Williams Ames, a Lloyds of London underwriter and Howard's cargo insurer. Ames' application presents a simple issue concerning the apportionment of court costs for which the losing defendants were cast. Howard's application, on the other hand, brings back into focus several legal issues litigated in these lengthy proceedings.
The circumstances giving rise to this litigation, stated more fully in our original opinion, are as follows: Plaintiff Borden, Inc. planned a shutdown of its methanol B plant (there were two plants, designated A and B) for the period from October 26, 1976 through October 30, 1976, during which the second and fourth stage compressors of plant B were to be shipped to Dresser Industries, Inc., Borden's repair contractor, for routine maintenance and repair (a "turn-around"). Dresser, acting as Borden's agent, made arrangements with Howard Trucking for the transportation of the fourth stage compressor from Borden to Dresser (approximately 60 miles). The freight charge was $192.00. While enroute to the Dresser facility, the Howard truck overturned, killing the driver and damaging Borden's compressor. Dresser repaired most of the accident caused damage to the compressor, and performed the routine maintenance and repairs as well. The compressor was returned to Borden on October 31, 1976. In reconnecting the compressor to the adjoining plant machinery, more than the normal amount of time was required because pipes attached to the compressor, and damaged in the accident, had to be realigned to make the appropriate connections. Complete start-up of the methanol B plant did not occur until 4:40 a.m. on November 2, 1976.
Borden filed suit against Howard and Northwest Insurance Company, Howard's comprehensive automobile liability, comprehensive general liability and contractual liability insurer.[1] Later, Ames, Howard's cargo insurer, was added as a defendant. Borden sought damages for the cost of repairing the compressor, for the extra labor necessary to re-install the compressor at the plant, and for the loss of production of methanol resulting from the delayed start-up of the plant.
Northwest filed a motion for summary judgment seeking to dismiss Borden's claims against it, arguing that policy exclusions relieved it from liability for property damage to cargo, and from consequential damages resulting from property damage to cargo. The trial court granted Northwest's motion. The Court of Appeal reversed, finding that the exclusionary clauses in the policy did not bar coverage for consequential damages, here, the damages plaintiff sustained due to the loss of use of its compressor during the time, made necessary by the accident, required to repair and re-install the compressor. Borden, Inc. v. Howard Trucking Co., Inc., 372 So.2d 242 (La.App. 1st Cir.1979). This Court denied writs, thus refusing to review the Court of Appeal's reinstatement of plaintiff's claim, for the reason that the judgment was not final. Borden, Inc. v. Howard Trucking Co., Inc., 373 So.2d 544 (La.1979). The case was then remanded (by virtue of the Court of Appeal judgment) to the trial court for trial of Borden's claims on the merits against all of the defendants.
Thereafter, Ames filed a motion for summary judgment to dismiss Borden's claim *1088 against it for consequential damages, contending that his policy exposure was limited to cargo, or property damage only. The trial court denied the motion. The case was then tried against Howard Trucking Co., Northwest Insurance Co. and Antoy Williams Ames.
The trial court rendered judgment in Borden's favor against Howard in the sum of $174,203.63: "$6,321.15, representing labor and material attributed to repairing the compressor as a result of the accident;" "$4,258.00 of extra pay" to re-install the compressor at the Borden plant; and "$163,623.48 as lost production." It denied Borden's claims against Northwest, finding that "Northwest Insurance Company provided no coverage for any of the damages sought by Borden." The trial court held Ames liable for damage to the cargo only ($6,321.15 and $4,258.00), and not consequential damages, in the amount of "$10,579.15, less its deductible of $5,000.00." Both Howard and Ames were held liable in solido for "legal interest from date of judicial demand and for all costs."
On appeal, in an opinion primarily concerned with the issue of Northwest's insurance coverage, the Court of Appeal affirmed the trial court award insofar as quantum was concerned, and affirmed relative to Ames' liability for damage to the cargo alone, but otherwise reversed. The Court of Appeal held that Northwest was liable in solido with Howard for the consequential damages plaintiff suffered (notwithstanding that it was not liable for damage to the cargo), for the reason that the Northwest policy did not clearly exclude such coverage. The court also held that Ames was only liable for costs in proportion to its liability on the total judgment, a mere 3% (with Howard and Northwest solidarily bound for 97% of the costs). Only Howard was held liable for the $5,000.00 of damage to the compressor not covered by Ames (the deductible under the Ames policy). Borden, Inc. v. Howard Trucking Co., Inc., 425 So.2d 893 (La.App. 1st Cir. 1983).
Concerned that the Court of Appeal may have erred in reversing the trial court's judgment and finding coverage for Howard under the Northwest Policy, we granted writs, without limitation, to review the lower court rulings. Borden, Inc. v. Howard Trucking Co., Inc., 429 So.2d 148 (La. 1983). Our original opinion addressed only the coverage issue, and, reversing the Court of Appeal on that point, held that the Northwest policy issued to Howard did not cover the consequential damages suffered by the plaintiff as a result of damage to the compressor caused by the accident. The last sentence of our majority opinion recited simply that Howard and Ames were cast for costs. As earlier indicated both Ames and Howard applied for rehearing. Both were granted on all issues raised.
Ames had been cast by the Court of Appeal for only 3% of the costs because the $5,579.15 judgment against him represented just 3% of the total damages awarded the plaintiff against the several defendants. Because our original opinion simply cast Howard and Ames "for costs" (conceivably ½ each) Ames asks on rehearing for clarification, or reinstatement of the portion of the Court of Appeal opinion requiring him to pay just 3% of the costs. The complaint is well taken. It was not our intention that Ames should be cast for more in costs than the percentage which his obligation ($5,579.15) bears to the total damages awarded to plaintiff against all defendants. However, because as will be seen in the balance of this opinion the damages to be awarded plaintiff Borden are reduced on rehearing, the percentage of costs to be borne by Ames will be 8%, the same percentage his obligation bears to the total of damages hereinafter allowed.
Unlike Ames' application Howard's contentions on rehearing are not so easily resolved. Howard requests reconsideration of all the issues, except fault, which it has raised heretofore in these proceedings.[2]
The issue which has predominated, if not monopolized, the appellate courts' *1089 considerations throughout these lengthy proceedings is whether the policy Northwest issued to Howard covers Borden's consequential damages.[3]
Howard, of course, contends that the Northwest policy does cover any consequential damages Borden suffered as a result of the accident in which Borden's compressor was damaged. Northwest, on the other hand, argues that it is not liable for such damages because they are excluded from coverage under all three sections of the policy it issued to Howard (comprehensive automobile liability, comprehensive general liability and contractual liability). On original hearing we resolved that issue in Northwest's favor, relying on what we believed to be the definition of "property damage" contained in the policy. On rehearing we come to a different conclusion, for the reasons which follow.
As properly set out in our original opinion, "[t]he law is well settled that if there is any doubt or ambiguity as to the meaning of a provision in an insurance policy, it must be construed in favor of the insured and against the insurer. When the ambiguity relates to an exclusionary clause, the law requires that the contract be interpreted liberally in favor of coverage. The primary object of all insurance is to insure, and exclusionary clauses are strictly construed against the insurer. Insurance Company of North America v. Solari Parking, Inc., 370 So.2d 503 (La.1979); Credeur v. Luke, 368 So.2d 1030 (La. 1979)."
In the instant case the provisions of the "Comprehensive General Liability Insurance" section of the policy issued by Northwest to Howard provided coverage for "all sums which the insured shall become legally obligated to pay as damages because of A. bodily injury or B. property damage" except for "property damage to ... (3) property in the care, custody or control of the Insured or as to which the insured is for any purpose exercising physical control," or for the "loss of use of tangible property which has not been physically injured...."[4] In other words, the policy *1090 provided coverage for all liability of the insured resulting from property damage except for (as pertains to this case) damage to the property itself in the insured's care, custody or control, and except for the damages for the loss of the use of tangible property which has not been physically injured. There is no exclusion for damages resulting from the loss of use of property which the insured has damaged. Absent an applicable exclusion, such damages are covered.
Notwithstanding the foregoing, on original hearing we determined that loss of use is not independent property damage, but merely a measure of damages resulting from the physical damage to the compressor, damage which is excluded under the policy. To so determine we found it "necessary to examine the definition of property damage contained in the policy." We located a definition which we believed related to this policy. It described property damage pertinently as "(1) physical injury to or destruction of tangible property which occurs during the policy period, including a loss of use thereof at any time resulting therefrom."
It was based on this definition, which we believed to be part of the policy in the record, that we found that loss of use of property was not covered by the policy even though only property damage (to property in care, custody or control of the insured) was expressly excluded therein.
The problem with that resolution is that we now find on closer scrutiny of the record that the definition of property damage upon which we relied on original hearing is not a part of the policy in the record.
A blank form insurance policy "jacket" bearing the foregoing property damage definition, a "jacket" which forms no part of Northwest's policy in this case, was received in response to an inquiry by this Court. Notwithstanding an opportunity to do so, pending rehearing, counsel in the case have not shown that the certified copies of the Northwest policy, which are contained in the record, include either the "jacket" or the property damage definition upon which we originally relied.[5] In fact, counsel for Northwest virtually concedes as much by arguing in supplemental brief, in response to our inquiry, only that Northwest should prevail without the support given their position by the original majority's reference to the property damage definition.
Without the definition of property damage upon which we relied in our original opinion, we cannot conclude that property damage as used in the exclusion in the policy under consideration means not only damage to the property in the insured's care, but, as well, consequential damages flowing from the loss of use of that damaged property.
Northwest's argument for exclusion of consequential damages is thus reduced to the suggestion that property damage to property in the care, custody or control of the insured impliedly includes, as opposed to being included by definition, the consequential damages which later arise as a consequence of the damage to the property that was in the insured's care, custody or control (that is, the loss of its use).
But exclusionary clauses must be interpreted strictly in the insured's favor. Implication will simply not suffice. Furthermore, there is a distinct and certain difference between property damage to property in an insured's care (the fourth stage compressor) and damages which are the consequence of damage to property (i.e., Borden's loss of methanol product, or profits therefrom, lost as a consequence of the loss of use of a damaged compressor). "Property damage" is not defined in the policy, but common sense dictates that it means damage to tangible property (pertinently, in the care, custody and control of Howard), and not consequential losses arising from loss of use of damaged property.
This conclusion is supported by the fact that other policy provisions expressly refer to consequential damages in the nature of *1091 damages resulting from the loss of use of property. However, those provisions, found in exclusion (m), only exclude from coverage damages for "loss of use of tangible property which has not been physically injured or destroyed ...." This indicates that the coverage, or exclusion, of damages for loss of use was likely specifically considered by the insurer, and the determination was made that only such damages where the property has not been injured or destroyed should be excluded from coverage.
The correctness of our conclusion seems even more evident when we note from Ames' policy how simple it would have been for Northwest to have excluded consequential damages. The pertinent part of Ames' policy reads:
1. This policy covers the liability of the insured for loss or damage to lawful goods and merchandise while in the custody or control of the insured ....
6. This policy does not insure the liability of the insured for:
c. Loss of market delay; loss of use or any other remote or consequential loss; (emphasis provided)
Furthermore, as the Court of Appeal noted, Howard could hardly have done more to protect itself from the liability in this case than to secure from Northwest coverages for comprehensive automobile liability, comprehensive general liability and contractual liability. Borden v. Howard Trucking Co., Inc., 425 So.2d 893 (La.App. 1st Cir.1983), at note 1.
Accordingly, absent a definition of property damage that would bring loss of use of damaged property within the specific exclusion, there is no provision in this policy which excludes such coverage. Therefore, we set aside that part of our original opinion which held otherwise, and now find that the Court of Appeal was correct in holding that Northwest did provide coverage for the consequential damages (loss of use) which Borden suffered as a result of the damage to its compressor.
Having found Northwest liable in solido with Howard for the consequential damages Borden sustained as a result of the accident, we turn to the question of quantum, not previously discussed by this Court. Defendants' arguments in this regard are three-fold: (1) that the lower courts erred in finding that plaintiff sustained any damages for loss of production because plaintiff failed to prove that it ever lost a single sale of methanol as a result of the delay in production; (2) that the lower courts erred in basing the value of the lost production in part on pre-November production figures (that is, those preceding the accident), when the plant was operating at 100% efficiency, rather than solely on post-November figures, when the plant (for reasons unrelated to the incident involved herein) was operating at significantly lower efficiency; and (3) that the lower courts erred in calculating the delay time, made necessary by the accident, in re-connecting the compressor at the Borden plant.
First, it should be pointed out that it is undisputed that Borden was delayed for some period of time (although the amount of time is in dispute and discussed below) in the start-up of its methanol B plant as a result of the accident. The question presented is the extent, if any, to which Borden sustained damages as a result of this delay.
(1) Defendant's Contention Regarding Plaintiff's Proof of Damages Incident to Lost Production Time.
Borden's accounting expert, one Jake Netterville, testified that plaintiff lost 29.41¢ for each gallon of methanol which Borden failed to produce during the delay time. He arrived at this loss of profit figure by taking the average net at site value, based on the sale price of methanol for that time period, 38.8¢ per gallon, and subtracting Borden's "production costs," 9.39¢ per gallon.[6]
*1092 On the other hand, defendants argue that Borden did not show that it suffered any loss at all. They contend that plaintiff did not establish that it lost even a single sale as a result of the delay in production. Since plaintiff's damages are based on loss of sales and consequent loss of profits, and since it has lost no sales, it has lost no profit, and thus sustained no damages.
The trial court, without reasons, used the 29.41¢ per gallon lost profit figure in calculating the monetary damages plaintiff sustained in lost production as a result of the delay. It is unclear whether the court was of the view that plaintiff had actually lost sales, or whether the court determined that was the proper measure of damages whether sales were lost or not. In either event, we believe the court erred in its utilization of that figure in calculating the damages sustained in this case.
The fact that an appellate court may disagree with the trial judge is not alone a ground for substituting its judgment for that of the trier of fact. Smith v. Government Emp. Ins. Co., 358 So.2d 1289 (La.1978); Spillers v. Montgomery Ward & Co., Inc., 294 So.2d 803 (La.1974). Before an appellate court can disturb an award made by a trial court, the record must clearly reveal that the trier of fact abused its discretion in making its award. Smith v. Government Emp. Ins. Co., supra; Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1974); Anderson v. Welding Testing Laboratory, Inc., 304 So.2d 351 (La.1974).
On the other hand, in a suit for damages, it is the plaintiff's burden to prove the damage he suffered as a result of defendant's fault, and to support an award there must be evidence in the record. Damages in the nature of lost profits resulting from an offense or quasi-offense must be proved with reasonable certainty. Damages will not be allowed where the lost profits are purely conjectural. Koncinsky v. Smith, 390 So.2d 1377 (La.App. 3rd Cir.1980); A.E. Landvoigt, Inc. v. Louisiana State Employees' Retirement System, 337 So.2d 881 (La.App. 1st Cir.), writs denied, 339 So.2d 852 (La. 1976).
Plaintiff in this case has simply not borne his burden of proving his damages for lost profits to a reasonable certainty. In fact, as correctly pointed out by defendants and acknowledged by the Court of Appeal, there is no evidence in the record that plaintiff's ever lost even one sale because of the delay in production that resulted from the accident. There was evidence that plaintiff's reserve level of methanol was reduced, or at least not augmented during the delay in plant start-up. And there was evidence that plaintiff purchased methanol some ten months after the incident, but no showing that that purchase was related to the loss of production resulting from the delay some ten months earlier. And there was no evidence that plaintiff had dissipated or substantially reduced its stock of methanol when it made the purchase of methanol some ten months later. Moreover, the production figures for the year in question, 1976, show a total production (admittedly for both the A plant and the B plant) of 1.5 million gallons of methanol in excess of what was anticipated for the year. Plaintiff's own expert witness admitted, on cross-examination, that under his accounting approach (using sale value) if no sales were lost within thirty days after the delay, then Borden would not have suffered a loss of profits. He stated:
If they were able to have provided within a thirty-day period everything the customer would have wanted during that thirty-day period, there would have been no loss.
Accordingly, absent a showing that plaintiff lost any sales because of the delay, it was error on the part of the trial judge to *1093 calculate plaintiff's damages based on lost profits by multiplying 29.41¢ (per gallon net profit on sales) by the number of gallons which might have been produced during the delay.
That is not to conclude however, as defendants argue, that plaintiff was not damaged. To the contrary, the record establishes that Borden was delayed in its ability to re-start the methanol B plant, after the turn around, because of the damage to the compressor which was caused by the accident. Borden typically ran its methanol plant continuously, absent some problem. Thus, Borden surely sustained damages as a result of the accident where it lost plant in-service time. While the loss of that time does not, as Borden argues, translate into damages for lost profits based on a sale price figure (because as stated above there were no lost sales proven), it does translate into some sort of loss when the inventory of methanol is reduced. We must then make an effort, however, inexact, to quantify that loss.
Borden operates on an annual accounting basis. The accounting period in question ended on December 31, 1976. At that point, when the inventory was taken, Borden had less methanol than it would have had if the delay caused by defendant had not occurred. Thus, Borden was damaged to the extent that its ending inventory of methanol was decreased because of the delay. Plaintiff's accounting expert stated that the value of the lost production, if not reflected in a loss of sales figure (because there were no lost sales), would be reflected in terms of lost inventory at a value of 14.11¢ per gallon of methanol.
Considering the inherent difficulty in quantifying, in monetary terms, the loss to Borden arising out of plant down time, and especially in light of the state of the record we review, we conclude that a reasonable, although perhaps imprecise, method of determining Borden's monetary loss is to multiply the number of gallons that might have been produced, times the value of the lost inventory, 14.11¢ per gallon. (This represents the value per gallon of methanol which would have been on hand at the close of the calendar year accounting period, December 31, 1976, had the plant not been delayed in start-up by the accident.)[7]
Thus, defendants' first argument concerning quantum is partially meritorious insofar as it complains of the trial court's use of the lost profits figure in computing plaintiff's damages. However, insofar as defendants argue that plaintiff has proven no damages, their argument fails. Accordingly, the value of the loss plaintiff sustained is amended to 14.11¢ per gallon of methanol not produced as a result of the down-time due to the accident.
(2) Defendants' Contention Concerning Production Rate for Calculating Damages
The trial court held that the average daily production was 279,146 gallons of methanol per day. This calculation was based on the average production of methanol for the year. Defendants argue that while, ordinarily, that might be a satisfactory method of calculating the average daily production, under the facts of this case, it is not appropriate.
Defendants point out that in calculating the production loss plaintiff suffered, the trial court used the company production figures for the entire year to arrive at an average daily and hourly production rate. The record indicates that the pre-accident production rate for the first ten months of the year was at approximately a 100% efficiency level, whereas, for reasons unrelated to the accident, the post-accident efficiency level for the last two months of the year was significantly lower, 80% in November *1094 and 44% in December. Defendants argue that it was error on the part of the trial court to figure the production loss based largely on the higher pre-accident figures, rather than only on the lower post-accident figures.
Plaintiff, on the other hand, argues that taking this given year to compute the average production rate for a given day was proper. Furthermore, while technically it might be argued that plaintiff's were deprived only of production based on the level for those latter two months, plaintiff points out that it was additionally really deprived of getting its machinery in full, proper working order two days sooner.[8] Thus the average production rate calculated on a given year's production is a proper figure to use.
We agree with plaintiff on this point. Defendants, by this argument, are urging a much too narrow calculation of plaintiff's damages. Plaintiff was deprived of the use of its fourth stage compressor because of the accident. Without the fourth stage compressor, plant personnel could not check out the other machinery in the plant. When the fourth stage compressor was returned and reinstalled, and start-up began, it was discovered that the second stage compressor was not working properly and it had to be sent off for two additional days for repair. However, there was no way for plaintiff to discover this without the fourth stage compressor being operational. Thus, the delay in plaintiff's ability to operate its plant, which resulted from the accident, caused Borden both a loss of production and a delay in being able to discover and correct the plant's other problems.
The trial judge made the determination that the production rate should be based on the average daily production for the year. That determination was not unreasonable and certainly not clearly wrong. Defendants' second argument concerning the production rate used to calculate plaintiff's damages is thus without merit.
(3) Defendants' Contentions Regarding the Calculations of the Delay Resulting from the Accident
As noted by the trial court, the delay period which resulted from the accident falls into three time frames: time loss in delivery of the compressor from Borden to Dresser; accident related time loss at Dresser in repairing the compressor; and accident related time loss after delivery of the compressor back to Borden, in re-installing the compressor.
The trial court found, and it has not been disputed, that nine hours and thirty minutes extra was taken to deliver the compressor to Dresser because of the accident. It was also determined that no extra time was taken to repair the compressor at Dresser, because the repairs made necessary by the accident were accomplished simultaneously with the regular repairs for which the compressor was sent to Dresser. Both these findings are supported by the record. And they are not contested here.
Only the accident related time loss after delivery of the compressor back to Borden is contested by defendant. Concerning this element, the trial court determined it took forty-five hours and twenty minutes to reinstall the compressor.[9] From that he *1095 subtracted the amount of time normally required to re-install a compressor (seven hours) and arrived at the additional re-installation time, made necessary because of the accident, of thirty-eight hours and twenty minutes.
The record does indicate that forty-five hours and twenty minutes elapsed between the time the compressor was returned to Borden and the time actual start-up commenced. However, the record does not indicate that the entirety of this delay occurred in connection with re-installation of the fourth stage compressor. At most, the record supports only a finding that thirty-four hours and ten minutes were spent re-installing the fourth stage compressor.[10] Thus the trial court erred in its determination that defendants' were responsible for any more than twenty-seven hours and ten minutes (thirty-four hours, ten minutes, minus the seven hours normally necessary to re-install a compressor) of the forty-five hours and twenty minutes that elapsed from the time the compressor was returned to the plant until actual start-up occurred.
Moreover, this assessment of the actual time spent at Borden to repair and re-install the compressor, because of damage caused in the accident (twenty-seven hours and ten minutes), is more consistent with the amount of damages awarded for the labor utilized to do that work (eleven men, for approximately twenty-two hours, at the rate of $18.00 per hour, $4,258.00), than is the thirty-eight hour figure utilized by the trial court.
Accordingly, we find that the trial court erred in concluding that the defendant was responsible for 38 hours and 20 minutes of down time. The record indicates, and will only support a finding, of twenty-seven hours and ten minutes of accident related additional time required to re-install the fourth stage compressor. Defendants' third argument concerning the computation *1096 of quantum, relative to re-installation time, thus has merit.
In summary, as relates to defendants' arguments on quantum, we find as follows. The trial court properly found that Borden's methanol B plant produced on an average 279,146 gallons of methanol per day during the year 1976. That breaks down to an average of 11,631.08 gallons per hour. Defendants were responsible for a thirty-six hour and forty minute delay in the operation of the plant (nine hours, thirty minutes and twenty-seven hours, ten minutes). Plaintiff's damages are to be measured by lost inventory valued of 14.11¢ per gallon geared to the methanol Borden was prevented from producing during the accident caused delay. Accordingly, Borden's proven damages amount to $60,175.00.
Finally, we address one last argument, one which weighed heavily in this Court's determination to grant the rehearing. Upon application for rehearing, defendants strenuously argued, as did amicus, that a carrier of goods for hire should not be held liable in tort to a shipper for monetary damages beyond repair or replacement of damaged goods, when the carrier is not informed by the shipper of the possibility of such damages at the outset, and when the carrier is not in a position reasonably to know otherwise that the possibility of such special damages exists.
The argument was prompted by the lower courts' decisions, as well as this Court's original opinion, casting the carrier in judgment for $163,000.00 in consequential damages, that is, for the loss of use of the damaged cargo, in a situation where the carrier received only $192.00 in freight charges.
There is a general rule that a party can incur liability in tort, notwithstanding a contractual relationship between parties, for consequential damages (here, loss of use) where the act causing the damage constitutes both a breach of contract and legal fault. Federal Insurance Co. v. Insurance Company of North America, 262 La. 509, 263 So.2d 871 (1972). See also Alexander v. Qwik Change Car Center, Inc., 352 So.2d 188 (La.1977); Wise v. Prescott, 244 La. 157, 151 So.2d 356 (1963); and Burnell v. Sportran Transit System Co., 421 So.2d 1199 (La.App. 2d Cir.1982), writs denied, 423 So.2d 1183 (La.1982). This is really not disputed by defendant or amicus. Rather, the principal thrust of their argument is that reasons of equity and public policy dictate that this Court should carve an exception to the general rule in the carrier/shipper situation. Defendants must fail in their argument, if only for the reason that their problem addresses itself to the legislature and not to this Court. To the extent that they rely upon statutory authority their argument also falls short because the codal articles upon which they rely do not afford defendants the remedy they seek.
Defendants and amicus argue that La.C.C. arts. 2751 and 2971 support their argument that consequential damages should not be allowed in an action by the shipper against the carrier.
La.C.C. art. 2751 provides that carriers "are subject, with respect to the safekeeping and preservation of the things intrusted to them, to the same obligations and duties which are imposed on tavern keepers in the title Of Deposit and Sequestration."
La.C.C. art. 2971 appears in the title Of Deposit and Sequestration, that is, Title XIII of the Civil Code. That article prescribes a $500.00 limitation on the liability, "contractually or delictually," of landlords and innkeepers.[11]
*1097 Perhaps today the carrier might find solace in that codal article limiting liability. Unfortunately for defendant here, however, the amendment to have La.C.C. art. 2971 apply to delictual liability, in addition to contractual liability, was passed by the Legislature only in 1982.[12] The claim in this case arose in 1976.
Before the 1982 amendment, and after the accident in this case, this Court held in Laubie v. Sonesta International Corporation, 398 So.2d 1374 (La.1981) that La.C.C. art. 2971's limitation of liability was not applicable to delictual liability, for which the innkeeper "must respond fully for breach of a delictual duty imposed by general law."
Accordingly, while the argument that a carrier's liability to a shipper in tort should be limited, may well have some merit if applied to an action arising today, it affords this defendant no relief, since the accident here occurred prior to the 1982 amendment which expanded the liability limitation to cover delictual as well as contractual liability.

Decree
For the foregoing reasons, we amend our decree on original hearing and hold as follows: (1) that there be judgment herein in favor of Borden, Inc. and against Howard Trucking Company, Inc. and its insurer, Northwest Insurance Company, in solido, in the sum of $60,175.00, together with legal interest from date of judicial demand until paid, and for their proportionate share of the costs;[13] (2) that there be judgment herein in favor of Borden, Inc. and against Howard Trucking Company, Inc. and Antoy William Ames, an Underwriter at Lloyds, London, in solido, in the sum of $5,579.15, together with legal interest from date of judicial demand until paid, and for their proportionate share of the costs;[14] and (3) that there be judgment herein in favor of Borden, Inc. and against Howard Trucking Company, Inc. in the sum of $5,000.00, together with legal interest from date of judicial demand until paid.
AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.
DIXON, C.J., concurs.
LEMMON, J., subscribes to the opinion and will assign additional reasons.
MARCUS, WATSON and BLANCHE, JJ., dissent and assign reasons.
MARCUS, Justice (dissenting).
Howard Trucking Company, Inc. and its insurer, Northwest Insurance Company, should not be liable for the consequential damages suffered by Borden, Inc. The risk of harm that Borden's methanol B plant would be shut down longer than planned because Howard negligently damaged Borden's compressor was not within the scope of the duty owed by the carrier to the shipper. Accordingly, I respectfully dissent.
*1098 WATSON, Justice, dissenting.
The majority does not address with any clarity or cogency the important issue on which the rehearing was granted: That is, whether the trucking company is liable to Borden for alleged consequential damages stemming from the claimed loss of production at the Borden plant because of its negligence in damaging the compressor which it had contracted to deliver for repair.
Consequential or special damages encompass loss or injury which does not flow directly and immediately from the act of the party, but only from some of the consequences or results of such an act. The majority states as a general rule that a party can incur liability in tort, notwithstanding a contractual relationship between parties, for consequential damages where the act causing the damage constituted both a breach of contract and legal fault. The majority errs, however, in concluding that the legislature has not addressed the special relationship that exists between a carrier and a shipper.
Article 2315 states the general rule that a tortfeasor is bound to repair the damages he has caused another. This general rule does not establish boundless liability but rather is subject to both statutory amplification and modification as well as judicial interpretation. In Book Three, Title Nine, Chapter 3 of the Civil Code, the Legislature provides special rules for the letting out of labor and industry. Section Two of this Chapter governs carriers and watermen. Article 2751, as the majority points out, subjects carriers to the same obligations and duties as are imposed on tavern keepers with respect to the safekeeping and preservation of things entrusted to them. While carriers and tavern keepers are subject to the same obligations and duties, the Civil Code has specifically addressed a carrier's liability in the event of loss or damage. Article 2754 provides:
"Carriers and waterman [watermen] are liable for the loss or damage of the things entrusted to their care, unless they can prove that such loss or damage has been occasioned by accidental and uncontrollable events." (Emphasis added)
In enacting Article 2754, the Legislature intended to specifically provide for carrier liability and the majority's reliance on Article 2971 is misplaced.
Louisiana courts have consistently interpreted this provision to provide that damages for injury to goods while in the possession of the carrier are computed as the difference between market value of the property in the condition in which it should have arrived at the place of destination and its market value in damaged condition in which it actually did arrive. Silverman v. St. Louis, I.M. & S. Ry. Co., 51 La.Ann. 1785, 26 So. 447 (1899); Rabon v. Red Ball Motor Freight, Inc., 292 So.2d 332 (La.App. 2 Cir.1974).
The general rule at common law is that special damages are not recoverable in an action against a carrier for loss of, or injury to, property shipped unless the carrier had notice or knowledge of the particular circumstances from which such damages would flow. Miller Engineering Co. v. Louisiana Ry. & Nav. Co., 145 La. 460, 82 So. 413 (1919); Zarn v. Southern Ry. Co., 50 N.C.App. 372, 274 S.E.2d 251 (1981), writ grant vacated, 304 N.C. 189, 282 S.E.2d 421; 13 C.J.S., Carriers, § 267 at 619 (1939). This principle of limited liability has been the rule at common law for one hundred and thirty years. In Hadley v. Baxendale, 9 Exch. 341, 156 Eng.Rep. 145 (1854), mill operators were forced to close operations in order to ship a broken shaft for repairs. The carrier was not informed of this situation and negligently delayed shipment. The court refused to award lost profits for the delay period holding that damages recoverable for a breach of contract were limited to those within the contemplation of the defendant at the time the contract was made.
While Hadley involved a breach of contract, the underlying public policy rationale of that decision should extend to actions grounded upon the negligence of common carriers. First, Article 2754 draws no distinctions *1099 as to liability whether a plaintiff's case sounds in tort or in contract. Second, carriage of goods for hire has long been recognized as vital to commerce and industry and is heavily regulated by both the state and federal government. The Louisiana Public Service Commission has the power to regulate rates charged by carriers, LSA-R.S. 45:163, and carriers are strictly prohibited by law from charging more or less than the approved rates, LSA-R.S. 45:168. It is common knowledge that contracts of carriage often involve the transport of sophisticated or highly complex machinery which by their nature may be indispensable to a business operation. A carrier's awareness of such factors should not be assumed by the mere fact that it agreed to transport such items.
Application of the traditional duty risk analysis supports the appropriateness of limited liability. Under the facts presented, there is no doubt that the carrier is liable to Borden for the costs of repairing the compressor. However, the rule of law which prohibits negligent damage to property does not necessarily require the negligent actor to be responsible for all damages flowing in a "but for" sequence from the negligent act.
Rules of conduct are designed to protect some persons under some circumstances against some risks. Malone, Ruminations on Cause-In-Fact, 9 Stan.L.Rev. 60 (1956). The policy question presented is whether defendant breached a legal duty imposed to protect against the particular risk involved. While the carrier was under a legal duty to transport the compressor in a safe manner, breach of that duty does not necessarily give rise to liability for all alleged economic losses beyond repair costs. Policy considerations must determine the reach of a particular rule of conduct. There must be an ease of association[1] between the rule of conduct, the risk of injury and the loss sought to be recovered. Hill v. Lundin & Assoc., Inc., 260 La. 542, 256 So.2d 620 (1972); PPG Industries, Inc. v. Bean Dredging, 447 So.2d 1058 (La., 1984). It is the role of the judge considering the moral, social and economic values involved, to determine whether the risk here encountered was within the duty owed the shipper by the carrier. In my opinion, it was not.
The liability of a carrier to a shipper should be limited to monetary damages for repair or replacement of damaged goods except in those situations where the shipper has provided advanced notice (and the carrier has agreed) that special damages will result to him if his goods are damaged or otherwise delayed in shipment. Accord Meyer v. Thompson, 284 S.W.2d 384 (Tex. Civ.App.1955), writ of error refused; Zarn v. Southern Ry. Co., supra.
I therefore respectfully dissent.
BLANCHE, Justice (dissenting).
In determining that Northwest Insurance Company was liable in solido with Howard Trucking Company for the consequential damages suffered by Borden, the majority has failed to undertake a duty/risk analysis to determine whether consequential damages ought to be awarded at all. Merely finding that "property damage" includes loss of use within the meaning of the contract of insurance does not end the inquiry. In my opinion, the duty owed by Howard to safely transport the compressor did not include the risk that Borden's methanol plant might be forced to close because of damage to the compressor. The possibility of such damages is simply too remote to impose the loss upon a carrier who received only $192.00 in freight charges. Barring special notification by Borden as to the consequences of the compressor's loss, the carrier's duty should extend only to those damages which were reasonably forseeable at the time of the contract of carriage.
Therefore, I respectfully dissent.

*1100 ON REHEARING
PER CURIAM.
Plaintiff has pointed out a typographical error in our rehearing opinion which should be corrected. We relied on Mr. Netterville's testimony to value plaintiff's damages at the value for lost inventory. We erroneously stated in the rehearing opinion that that amount was 14.11¢ per gallon of methanol when we intended it to be 14.411¢ per gallon. This difference causes an increase in the judgment in Borden's favor of $1283.69. Accordingly, we amend our judgment on rehearing to reflect this correction, increasing the judgment in Borden's favor, and against Howard and Northwest in solido, by $1283.69. Otherwise, the rehearing applications of both Borden and Northwest are denied.
MARCUS, BLANCHE and WATSON, JJ., would deny the rehearing application of Borden and grant the application of Northwest.
NOTES
[1] Ames was only held liable for the cost of repairs for the physical damage to the compressor ($10,579.15 less its deductible of $5,000).
[2] Northwest had earlier filed a motion for summary judgment to dismiss Borden's claims against it based on an automobile insurance policy exclusion. The trial court had granted the motion, but the court of appeal had reversed and remanded, finding that the exclusionary clause did not exclude coverage for loss of production resulting from the damage to the compressor. Borden, Inc. v. Howard Trucking Co., Inc., 372 So.2d 242 (La.App.1979), writ denied, 373 So.2d 544 (La.1979).
[3] Apparently Borden placed most reliance on the comprehensive automobile liability coverage in its claims for damages. Borden alleged that the negligence of Howard's employee in operating an insured vehicle caused damage to Borden's property. Since the provisions and exclusions relating to property damage liability are basically the same in the three types of coverage contained in the Northwest policy, the same arguments will generally apply to all of them unless otherwise specified.
[1] Northwest had issued a multifaceted liability policy to Howard containing different and distinct sections providing these three types of coverage as well as worker's compensation coverage.
[2] Howard does not dispute on rehearing the consistent finding by our courts that its employee was at fault in the accident.
[3] As set out supra in the text, the accident giving rise to this litigation occurred in October of 1976. The case has been through the Court of Appeal and before this Court previously on this same issue. The Court of Appeal reversed the trial court judgment, which had dismissed Borden's claims against Northwest, and remanded the case for trial against Northwest. See 372 So.2d 242 (La.App. 1st Cir.1979), writ denied at 373 So.2d 544 (La.1979).
[4] The "Comprehensive General Liability Insurance" policy issued by Northwest to Howard provides in pertinent part:

I COVERAGE ABODILY INJURY LIABILITY COVERAGE BPROPERTY DAMAGE LIABILITY
The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of
A. bodily injury or
B. property damage
to which this insurance applies, caused by an occurrence ....
EXCLUSIONS
This insurance does not apply:
(k) to property damage to
* * * * * *
(3) property in the care, custody or control of the Insured or as to which the Insured is for any purpose exercising physical control;
* * * * * *
(m) to loss of use of tangible property which has not been physically injured or destroyed resulting from
(1) a delay in or lack of performance by or on behalf of the Named Insured of any contract or agreement, or
(2) the failure of the Named Insured's products or work performed by or on behalf of the Named Insured to meet the level of performance, quality, fitness or durability warranted or represented by the Named Insured;
but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the Named Insured's products or work performed by or on behalf of the Named Insured after such products or work have been put to use by any person or organization other than an Insured;
The pertinent provisions of all three sections of the policy are quoted in the original opinion. The provisions of the contractual liability section are virtually identical to these, and those of the automobile coverage section are similar, omitting only the corresponding part (m) of the above quoted section. Finding coverage under this section, however, we deem it unnecessary to discuss the other sections of the policy.
[5] We do not cast aspersions upon any counsel in this case.
[6] In computing "production costs" Borden's "fixed costs" (those incurred whether the plant operates or not) were not included, although technically they would constitute "production costs." Defendants disputed this accounting method. However, we are not persuaded by their arguments. As correctly pointed out by plaintiff, fixed costs are not relevant where the question is, as here, the extent to which plaintiff must be reimbursed to be placed in the same position it would have been in had the delay not occurred.
[7] Mr. Netterville's testimony, the only accountant expert to testify, supports and in fact is the basis of this finding. On cross-examination he stated that in the absence of a showing that plaintiff ever lost a sale, defense counsel was correct in his assertion that plaintiff lost no profits. However, Mr. Netterville went on to state that, notwithstanding that plaintiff may not have lost a sale, and thus profits, it nevertheless sustained a loss reflected in depletion of inventory which he valued at 14.11¢ per gallon.
[8] The entire plant could not operate without each compressor. Thus, without the fourth stage compressor defendant damaged, plaintiff was unable to test its other plant parts, during that period of time, and get them in working order. Consequently, plaintiff argues that it was not simply deprived of this lower level of production, but was also deprived of getting its plant in perfect working order that much sooner.
[9] The compressor, which was damaged in the accident, has piping extending from it. This piping connects the compressor to the other plant machinery. In the accident, the compressor fell off the truck, hit the pavement and rolled over. The compressor is so heavy that when this happened, some of the piping was bent. The piping from the compressor must align with the piping on the plant machinery. Thus, the piping had to be re-aligned when the compressor got back to the Borden plant to match up again with the connecting piping in the plant. This re-alignment process was effected by heating the piping to a degree which enabled it to be bent back into place.
[10] It is not disputed that the fourth stage compressor arrived at Borden at 7:20 a.m. on October 31, 1976. Maintenance was immediately notified (tr. 271) and Mr. Tom Williams, maintenance foreman for the re-installation of the fourth stage compressor, stated that he arrived at the plant within twenty minutes of being called, as did his crew, and immediately commenced working. (tr. 445). Mr. Williams stated that he and his ten man crew worked nonstop for over twenty-three hours re-installing the fourth stage compressor. (tr. 440-442).

Mr. Ralph Abbott, the Mechanical Maintenance Manager for Borden, corroborated Mr. Williams' testimony. Mr. Abbott testified from the "time sheet for the work order number to work the fourth stage compressor" that it took "some eleven people working twenty-three and a half hours to install the fourth stage compressor." (tr. 204).
Plaintiff's counsel refers us to the testimony of Mr. Marshall Owens, who at the time in question was the production superintendent of the Methanol B unit, to support the trial judge finding that re-installation took 45 hours and 20 minutes.
Mr. Owens testified from the company log. As pertains to the completion of the re-installation of the fourth stage compressor, the log and Mr. Owens testimony provide the following: An entry for November 1, 1976 at 4:00 a.m. provides, "Maintenance has fourth stage discharge line reinstalled. They located some old studs in salvage yard, cleaned them up and cut to size." The next entry occurred at the time of the shift change, about 6:00 to 7:00 a.m. on November 1, 1976, and provides, "Maintenance has all large piping hooked up to the fourth case. Still have some smaller piping to straighten and hook up. Have not tightened any piping. Alignment of the fourth stage complete and working on fifth stage alignment." The next entry is only marked "A" shift, representing a time period of anywhere from 7:00 a.m. to 3:00 p.m., and provides, "Maintenance working on fourth case." Finally there is an entry for 5:30 p.m. on November 1, 1976, which provides, "Put low stage on turing gear." Mr. Owens explained that procedure represented "the first thing we would do on start-up."
Thus, in effect, the last specific entry about alignment work on the fourth stage compressor, made necessary because of the accident, related to a time period between 6:00 and 7:00 a.m., which is consistent with the earlier testimony that re-installation of the fourth stage compressor took only 23.5 hours. Nevertheless, viewing the evidence most favorably to plaintiff, the entry that truly indicates that re-installation was complete is the 5:30 p.m. entry which indicates the time start-up was commenced (indicating completion of all re-installation work). Moreover, defendants do not argue for a reduction beyond that point. Accordingly we conclude that the record only supports the finding that thirty-four hours and ten minutes (from 7:20 a.m. on October 31, 1976 to 5:30 p.m. on November 1, 1976) were spent re-installing the fourth stage compressor.
[11] La.C.C. art. 2971 provides:

No landlord or innkeeper, or his officers, clerks, agents, or employees shall be liable contractually or delictually under the provisions of the foregoing six articles to any guests or party of guests occupying the same apartments for any loss of cash, jewelry, rare art items, furs, cameras, or negotiable instruments sustained by such guests or party of guests by theft or otherwise, in any sum exceeding five hundred dollars, unless by special agreement in writing with the proprietor, manager or lessee of the hotel or inn a greater liability has been contracted for.
No guest shall be held bound by the limitation of value established in this article if any of the following conditions occur:
1. The landlord or innkeeper fails to provide a safe deposit facility for valuables.
2. The landlord or innkeeper fails to conspicuously post this article in the guest room and registration area.
3. The guest avails himself of the safe deposit facility provided by the landlord or innkeeper. (emphasis added)
[12] La.C.C. art. 2971, prior to the 1982 amendment, provided:

No landlord or innkeeper shall be liable under the provisions of the foregoing six articles to any guests or party of guests occupying the same apartments for any loss sustained by such guests or party of guests by theft or otherwise, in any sum exceeding one hundred dollars, unless by special agreement in writing with the proprietor, manager or lessee of the hotel or inn a greater liability has been contracted for.
Provided that no guest shall be held bound by the limitation of value established in this Article unless this Article is conspicuously posted in the guest room.
[13] The proportionate share of the costs to be borne by Howard and Northwest, in solido, is 92%.
[14] The proportionate share of the costs to be borne by Howard and Ames, in solido, is 8%.
[1] Troublesome questions come to mind: Were the damages foreseeable? Can common carriers refuse shipments? Are tariffs adjustable to cover the risk involved? Would carriers accept a $192 fee for a $60,175 damage risk?