EDWARDS, Judge.
Ora D. Watson, individually and as tutrix of her minor child, Jo Ann, and her six major children sued Earl Creel and his insurer, State Farm Fire and Casualty Insurance Company, for the wrongful death of her husband, Doyle Watson, killed in a deer hunting accident by Earl’s twelve year old son, Shane. She settled with Farm Bureau Insurance Company, Shane’s mother’s insurer, for 85% of the policy limits in exchange for a restrictive release and eonven-ant not to sue Shane. State Farm declined a similar discounted settlement offer, denying any liability on the part of Shane or his father.
At trial the jury returned a verdict in favor of the defendants, finding that the decedent, Doyle Watson, was 100% at fault in causing the accident. The trial court entered judgment in conformity with the verdict and dismissed the suit. Plaintiffs appeal.
The principal issue is whether the jury was clearly wrong in finding Doyle Watson solely at fault in causing the accident.
Plaintiffs’ main theory at trial was that Shane mistook Watson for a deer because of the color of Watson’s clothing and that he negligently fired his rifle before properly identifying and distinguishing his target, especially at dusk when visibility was poor. In addition to his vicarious liability for the negligence of his son, plaintiffs base Earl Creel’s personal negligence on his failure to train and supervise Shane in the proper and safe use of his weapon, in allowing Shane to hunt alone, unattended and unsupervised, and in allowing him to use a dangerous rifle, with which he had limited experience and which was beyond his capability and maturity to handle safely.
The defendants’ theory was that Shane actually sighted a deer and fired only after he had properly identified his target. They *1237 contend that Doyle Watson was solely at fault in causing the accident, first, in walking into Shane’s line of fire, after having positioned Shane there himself and instructed him where to watch for emerging deer, and second, in failing to wear the required “hunter’s orange” vest under LSA-R.S. 56:143 or otherwise make himself more visible to Shane and the other hunters.
According to the record, Willie Creel, his son Earl, Earl’s son Shane, and Earl’s sixteen year old stepson, Tony, arrived at Doyle Watson’s farm about three o’clock in the afternoon on December 29, 1981, to go deer hunting. Willie Creel and Doyle Watson had been friends for a number of years. After a short visit, they all drove out into the field behind Watson’s house to position themselves for the hunt. Each hunter was armed with a shotgun, except for Shane, who was using a Marlin .30-30 rifle, which his father Earl had given him for his twelfth birthday a few weeks before. Each was wearing a vest or a jacket with the required “hunter’s orange” under LSA-R.S. 56:143, except for Watson who was wearing a green and brown camouflaged jacket over a white t-shirt, gray work pants, and a dark baseball cap with a white front.
Tony was positioned in a deer stand about 500 yards into the field along the side of a winding road. Shane was positioned in a deer stand farther down on the edge of some woods, overlooking a large field, which was about 433 feet wide and 950 feet long. The field rolled into a slight knoll in the middle and then sloped gradually down to the edge of some woods on the other side. The grass in the middle of the field stood about two feet high. Because of this grass and the knoll, only the upper half of a man, walking along the edge of the woods on the other side, could be seen from the deer stand.
Mr. Watson showed Shane where to watch for the deer, which usually appeared out of the woods on the other side of the field to eat his turnip greens, and told him if he tired of watching from the deer stand or became cold to climb down and sit behind some hay bales close by. Earl Creel was positioned next, farther down out of sight of Shane. Willie Creel and Doyle Watson positioned themselves last.
According to Earl, when the sun began to set a couple of hours later, he climbed down out of his stand to wait for Willie to pick him up in the truck. At approximately 5:25 p.m., he heard the retort of Shane’s rifle. When Willie picked him up, they drove over to Shane’s stand and saw him standing in the middle of the field looking for something. He told them, as they approached, that he had seen and fired at a deer standing next to a puddle of water. They all began looking around for a deer, but after a few moments, Earl found Watson’s body lying face down in a rutted road which paralleled the woods directly across from Shane’s stand. He had been shot once in the head. Death was apparently instantaneous.
According to Shane, after a couple of hours in the stand, he grew cold and moved over to the hay bales. Scanning with the scope of his rifle, he spotted a deer in the middle of the field. It had a brown body and a white patch on its chest and was moving up and down the field. He watched it for about five minutes: It lowered its head to drink from a puddle of water, and when it raised its head up again, Shane fired.
Captain Jack Underwood, Chief of Detectives of the Washington Parish Sheriff’s Department, arrived around 6:10 p.m. He testified that visibility was still pretty good. It was still “good dusk;” not exactly nightfall yet. The position of the body and the trail of footprints indicated that Watson had been walking along the rutted road at the edge of the woods in the direction of his house, apparently heading for home after the hunt. There were no obstructions across the field except for the roll of the hill itself and the knoll in the middle. The distance between Watson’s body and the hay bales measured 461 feet.
Arceneaux v. Domingue, 365 So.2d 1330 (La.1978) obliges us to accept the findings *1238 of the jury, just as we would the findings of a trial judge, when they are based upon a reasonable evaluation of credibility, and prohibits us from reversing those findings, even though we may have made different findings had we tried the case, unless the record as a whole establishes them to be clearly wrong.
In this case, as tragic and as senseless as Mr. Watson’s death was, we cannot say that the jury’s finding is clearly wrong, turning as we think it does on the witnesses’ credibility.
Shane was quite positive in his testimony about actually sighting a deer and firing at it after properly identifying his target:
Q. ... Now, when you were at the stand there, what kind of vision did you have? Would you classify it as good or were there any problems or obstructions to your visibility?
A. Yes, it was good visibility except there was kind of a weed grass about this high all through the field.
# ⅜ >Js sH sjc ⅜
Q. Okay, Shane, now lets go back to, you are saying that you thought you saw something. Okay, now where was it that you thought you saw something at first?
A. ... Where I thought I saw something, I was maybe right about here, and I thought I saw something about there. It was straight in front of me.

Q. What did you think you saw when you first saw it? What occurred to you?
A. To the best of my knowledge, I saw a deer. It was brown up in here around the body area and up in the chest it was white, and that is to the best of my knowledge what I saw.
Q. Now when you first saw what you thought you saw there, was it coming out of the woods or had it already gotten out of the woods?
A. It had already • gotten out of the woods.

Q. Now what did you do when you first saw it and you thought it was a deer at the time, tell us what happened.
A. Well, I sat there and I looked at it through the scope for about five minutes and after that it would move from the right to the left a little bit and would move back to the right.
Q. Um hum.
A. After a while, I just fired at it.
Q. You were convinced at that time that it was a deer then?
A. Yes, sir.

Q. Ok, now why did you look at it that long, Shane, in your own words?
A. I was looking at it to be sure what I was shooting at.
Q. So you had some reservations at first and then you looked at it longer to be sure through the scope?
A. Yes, sir.
Q. I see. And you convinced yourself that it was deer and you went ahead and shot.
A. Yes, sir.
* >S ⅜- ⅜ ⅜ sjc
Q. Is there any doubt in your mind that what you saw was a deer?
A. No, sir.
Accepting this testimony as true, a jury could have reasonably concluded that despite his age Shane exercised reasonable care in identifying the deer before firing and that despite the lateness of the hour it was Watson’s negligence in walking into Shane’s line of fire and in failing to make his presence known or to wear the highly visible hunter’s orange vest that resulted in his accidental shooting death. While it is true that failure to wear the required hunter’s orange vest does not constitute negligence per se so as to bar recovery, Breitkaupt v. Sellers, 390 So.2d 870 (La.1980), a hunter nonetheless has a duty, to himself, to prevent accidental shootings by making his presence known to other hunters, which is usually easily accomplished by wearing highly visible clothing. Indeed, the dark colors of Mr. Watson’s *1239 clothing at dusk against the wooded backdrop very nearly made him invisible. Not even the most experienced hunter can be expected to see the invisible.
We therefore affirm the jury’s verdict and the judgment of the court below dismissing plaintiffs’ claims. Accordingly, we need not discuss other issues raised by the parties regarding damages and insurance coverage.
The trial court assessed all costs against the defendants, who have answered the appeal as to that judgment. Although the trial court enjoys great discretion in the assessment of costs, the general rule is that the party cast in judgment should pay all costs of the trial. La.C.C.P. art. 1920 gives the trial court this discretion, but the appellate courts are required to review its ruling under La.C.C.P. art. 2164. Borden, Inc. v. Howard Trucking Co., Inc., 425 So.2d 893 (La.App. 1st Cir.1983), aff'd, 454 So.2d 1081 (La.1984) (on rehearing). We find that since the defendants were found to be without fault, costs should have been assessed to plaintiffs. The judgment of the trial court with respect to costs is reversed. Appellants are taxed for all costs of these proceedings.
AFFIRMED IN PART, REVERSED IN PART.