486 So.2d 789 (1986)
GREAT AMERICAN SURPLUS LINES INSURANCE CO. and Caribbean Pools, Inc.
v.
George BASS and Bass Industries, Inc.
No. CA 84 0955.
Court of Appeal of Louisiana, First Circuit.
March 25, 1986.
Dissenting Opinion April 29, 1986.
Writ Denied June 6, 1986.
*790 Maurice P. Mathieu, Houma, for plaintiff, Great American Surplus Lines Ins. Co.
William F. Dodd, Houma, for defendant, George Bass.
Donna Cobb and Leopold Babin, Houma, for Bass Industries, Bass Refrigeration, Marine Supply & Home Ins. Co.
Joseph A. Reilly, Jr., Houma, for Carribean Pools.
John W. Waters, Jr., New Orleans, for Great Southwest Fire Ins. Co.
Russell O. Ayo, Thibodaux, for intervenor, Point Coupee Lumber Co.
Before COLE, CARTER, SAVOIE, LANIER and ALFORD, JJ.
ALFORD, Judge.
This is an appeal from a judgment dismissing both the principal and incidental demands for damages sustained in a fire which occurred on July 23, 1980, in a building owned by George Bass and occupied by Bass Tire Service and Carribean Pools, Inc.
In the original action, the plaintiffs, Carribean Pools, the lessee of the damaged building and their property insurer, Great American Surplus Lines Co., sought recovery from the defendants, George Bass and his corporations, Bass Industries, Inc. and Bass Refrigeration and Marine Supply, Inc., under the theory of lessor-owner strict liability. In the reconventional demand, Home Insurance Company, the principal defendants' insurer, sought recovery from Carribean and its liability insurer, Great Southwest Fire Insurance Company, alleging that the lessee's negligence caused the fire and that lessee had contractually assumed responsibility for its portion of the building's electrical system. After hearing testimony and reviewing the evidence, the trial judge determined that neither the original plaintiffs nor the plaintiffs in reconvention proved their cases by a preponderance of the evidence. Therefore, the court dismissed all demands. We disagree in part and reverse as to the principal demand.

FACTS
On February 18, 1980, George Bass leased a portion of a building owned by him individually to Carribean Pools, Inc., a company that was wholly owned by William Lerwick. Carribean was to use the leased portion of the building for the manufacture and sale of above ground swimming pools.
The area leased to Carribean was an empty shell. Mr. Bass agreed to have employees of one of his corporations, Bass Refrigeration and Marine Supply, Inc., renovate the premises to meet the physical layout, electrical and plumbing requirements of Carribean. The written lease executed by both parties contained the following provisions in regard to the premises, once the renovation was completed.
Lessor agrees to maintain the structural soundness of the building, including the roof, exterior walls, and the slab, except for conditions or damage caused by the negligence or acts of lessee, their agents or persons acting pursuant to their direction and control. Lessee agrees to maintain the interior of the building, in good repair, including the walls, floors, plumbing, electrical wiring, fixtures, heating and airconditioning units, and plate glass.
Lessee may install or cause to be installed such equipment and trade and other fixtures as are reasonably necessary for the operation of his business.
Shortly after occupying the premises in February, Carribean experienced trouble with the air conditioning system tripping the circuit breakers. Employees from Bass Refrigeration repaired the system, a process which took more than a month. Carribean also started experiencing trouble with *791 circuit breakers tripping while its employees were using electric power tools such as saws and drills. Testimony showed that whenever the blade of a saw would bind, it would trip the corresponding circuit breaker.
Carribean started business with two employees in addition to Mr. Lerwick. As summer approached, business increased and Carribean hired additional personnel, up to a total of 14. In June of 1980, Carribean rented additional space in the same building in an effort to expand its production facilities. In order to reach the additional space, employees of Carribean tore down part of a partition to which electrical receptacles were attached. The operation required Carribean personnel, including Mr. Lerwick, to relocate the receptacles to a position on a post near a workbench.
Because of the increase in Carribean's business, the electric power tools and several extension cords were in continual use during working hours. The constant use of this equipment caused the circuit breakers to trip more often, to the point of seven to eight times during a work day. Mr. Lerwick complained to Mr. Bass several times about Carribean's electrical problems. As a result of these complaints, one of Bass Refrigeration's non-licensed electricians, Kim Burton, inspected Carribean's facility several times and determined that the existing circuits were overloaded due to the machinery in use. Two days before the fire, Mr. Burton installed two additional 110 volt circuits and two 20-amp circuit breakers in Carribean's work area. Mr. Burton placed the receptacles for the two additional circuits on the same post as the relocated receptacles. Mr. Burton's supervisor at Bass Refrigeration, Lee Bergeron, testified that he inspected Mr. Burton's work and that it was done properly.
After working hours on July 23, 1980, a fire caused extensive damage to the building. Approximately one month after the fire, Mr. Lerwick left the state and moved to New York where he had previously resided. He failed to pay two of his suppliers, Pointe Coupee Lumber Company, Inc. and Weaver Lumber and Supply Company, Inc., for construction materials received by him. Both companies secured default judgments against Carribean for the monies owed. Mr. Lerwick has never attempted to reestablish his business in Louisiana.
As a result of the fire, Great American, as Carribean's property insurer under a contents policy, determined that Carribean had suffered a contents loss of $80,674.18. They paid Carribean their policy limits of $70,000 and secured the salvage and subrogation rights. Home Insurance Company, as the building and contents insurer of Mr. Bass's corporations, determined that the property had suffered a loss in the amount of $87,889.15. They paid $72,768.75 to Mr. Bass after applying their co-insurance penalty and the $100 deductible, and secured subrogation rights. The suit before us now is an attempt by both insurance companies to recover under their subrogation agreements and by Carribean and Mr. Bass to recover for their uncompensated damages.

ORIGIN OF FIRE
In his reasons for judgment, the trial judge made the following determination:
The totality of the evidence indicates that the fire was caused by improper matching of breakers and wiring. Amperage ratings in the breakers exceeded what it should have been, given the gauge of the wire. This proximately caused the fire and resulting damage.
The trial court's findings of fact should not be disturbed on appeal, absent a finding of manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Expert testimony adduced at trial indicated that the fire originated in Carribean's work area, with the point of origin being the post next to the workbench. This is the area where receptacles had been placed by employees of both the lessor and lessee. Mr. George Webb, who was accepted as an expert in electrical engineering, testified that he inspected the circuit breaker panel box and found several instances where the breakers *792 were oversized in relation to their wiring (12 gauge wires were matched with 30-amp breakers instead of 20-amp breakers), the result being that the breakers would not always trip when the wires became overheated. This allowed the insulation around the wires to deteriorate and make the wiring vulnerable to fire. Mr. Webb noted that mismatched 12 gauge wires ran from the breaker box back to Carribean's work area. He also stated there was evidence of short circuits in some of the burned wiring. Testimony by Mr. Lerwick and Mr. Burton showed that the 12 gauge wires leading to the receptacle were placed side by side, but were not bundled together. Testimony revealed that wiring which touches generates more heat than when it is spread apart. As to the repeated tripping of the circuit breakers because of overload, Mr. Webb testified,
If it had been proper coordination between the circuit breakers and the wire, then we should not have had a hazardous situation ... Such things as a saw binding or two (sic) many tools at one time would cause a circuit breaker to trip and prevent any hazardous situation from arising. Now it would be a nuisance to the person using the tools, but it would not be a hazardous situation such as would lead to a fire.
He also stated that as a circuit breaker becomes more sensitive through repeated trippings, it trips at a lower current and becomes safer. Thus from the evidence in the record, we cannot say that the trial court's finding as to the cause of the fire is clearly wrong.

LIABILITY
Having determined the cause of the fire, the trial judge made the following findings:
It is the finding of the Court that the Plaintiffs, Great American Surplus Lines Insurance Company and Carribean Pools, Inc. have failed to bear the burden of proof that the Defendants, or any of them, installed the breaker switches that were found after the fire to be improperly matched to the wiring.
The Court, therefore, dismisses the principal demand.
In the reconventional demand filed by Bass Refrigeration and Marine Supply and the Home Insurance Company against Carribean Pools, Inc., the Court finds that the Plaintiffs in reconvention have likewise failed to bear the burden of proving that the fire was caused by the negligence of Defendants in Reconvention therefore, the Court also dismisses the Reconventional demand.
Plaintiffs on the principal demand contend the trial court erred in finding that plaintiff must show negligence on the part of the owner-lessor in order to recover. We agree.
An owner-lessor is held to "strict liability" for injuries sustained by a tenant through a defective condition of the premises. This liability attaches whether or not specific knowledge on the owner-lessor's part can be shown so that neither his ignorance of the defect nor its latency will defeat the injured person's recovery. La. Civ.Code arts. 2322, 2695. Smith v. Hartford Accident and Indemnity Co., 399 So.2d 1193 (La.App. 3d Cir.1981), writ denied, 406 So.2d 604 (La.1981). Thus the burden of proof which the plaintiffs must meet in an action arising under either Civ. Code art. 2322 or 2695 is to show by a preponderance of the evidence that a defect in the building caused the injury complained of. Freeman v. Thomas, 472 So.2d 326 (La.App. 3d Cir.1985). No showing of negligence is required. Barnes v. Housing Authority of New Orleans, 423 So.2d 750 (La.App. 4th Cir.1982).
In the instant case, we noted previously that the court found that a defect in the premises caused the fire. Therefore, for the defendants to escape liability in this case under either of the cited codal articles, they must prove that the fire was caused by the fault of the lessee[1], or that the *793 lessee had assumed responsibility for the condition of the premises under LSA-R.S. 9:3221 with the lessor having no knowledge of the defect.
The trial court specifically noted that the original defendants had not proved negligence on the part of Carribean. The record shows that all the involved parties deny placing the oversized breakers in the circuit breaker box. Mr. Bass admits that his employees did the initial wiring of the facilities for Carribean. Carribean admits moving some of the wires and receptacles near where the fire originated. Both parties admit knowledge that the circuits were overloaded, and that the overload was causing the breakers to trip. Carribean employees reset the breakers whenever they tripped. However, as noted earlier, there was expert testimony that overloads which cause repeated tripping of breakers do not create hazardous situations in regard to fires. There was no testimony adduced to show that Carribean's employees had performed any electrical work in or near the circuit breaker panel box. Thus, we are unable to say that the trial court's finding of no proof of negligence on the part of Carribean is manifestly wrong.
Defendants also allege that the lessee had assumed all responsibility for the electrical wiring as part of the written contract of lease, and that the electrical system was in the lessee's care and custody. The pertinent statute provides that the lessee who assumes responsibility for the premises can not recover from the owner for any injury caused by defects therein, "unless the owner knew or should have known of the defect or had received notice thereof and failed to remedy it within a reasonable time." LSA-R.S. 9:3221 (emphasis ours). Even if Carribean had assumed responsibility for the electricity, the record is replete with evidence that the lessor continued to be involved with the electrical problems encountered by Carribean. Mr. Burton, the lessor's employee, made several trips to the leased premises because of complaints about the circuit breakers tripping. He determined that the circuits were overloaded and reported this to his supervisor. Two days before the fire, Mr. Burton installed additional circuits and wiring in the area where the fire started as well as adding two circuit breakers to the panel box which housed the mismatched breakers. He testified that he did not notice anything out of the ordinary in the circuit breaker panel box, but that he did not inspect the other breakers at that time. Nevertheless, Mr. Burton was actively involved with working on the electrical system on the lessee's premises. Thus the lessor-owner knew or should have known of the defect, and is liable for the damages suffered by Carribean.

DAMAGES
Carribean alleges $80,674.18 in damage to inventory, of which $10,674.18 was not covered by insurance. Additionally, Carribean alleges lost profits in excess of $218,000. The appellate court shall render any judgment which is just, legal and proper upon the record on appeal. La.C.C.P. art. 2164. Courts of appeal are empowered to award damages in cases where the trier of fact erroneously rejects the plaintiff's demands, and the record is complete with regard to damages. Dupree v. Louisiana Transit Management, Inc., 441 So.2d 436 (La.App. 2d Cir.1983), writ denied, 445 So.2d 1233 (La.1984).
The proper goal of a damage award is to restore the plaintiff, as closely as possible, to the position which he would have occupied had the accident never occurred. Carter v. Gulf States Utilities Co., 454 So.2d 817 (La.App. 1st Cir.1984). In determining the amount of damage to property, the cost of replacing the property, less reasonable depreciation, can be used. See Carter, 454 So.2d at 820. The burden of proof is on the plaintiff to establish by competent evidence the extent of the damages. Martin v. Cotton's Pest Aid Control of Baton Rouge, Inc., 424 So.2d 1216 (La.App. 1st Cir.1982).
In the instant case, Donald Grissom, an insurance adjuster with Crawford and Company, testified as an expert witness in *794 regard to the value of Carribean's property at the time of loss. He stated that he verified the items by examining the debris. The record shows he verified values by examining Carribean's books for costs and by spot checking the listed costs against catalogs. Mr. Grissom arrived at a cash value of $80,674.18 for the property after depreciation. Mr. Marion I. Starnes, III, testified as an expert appraiser. He estimated Carribean's loss at $80,292.00 after depreciation, $382.14 less than Mr. Grissom's figure. However, Mr. Starnes indicated he felt that the differences were small ones and opined that his catalog sources as to value may have been different from where the items were actually purchased. We therefore accept Mr. Grissom's determination as to the value of the damaged items.
Carribean also seeks damages for lost profits. Damages in the nature of lost profits must be proved with reasonable certainty; damages will not be allowed where lost profits are purely conjectural. Borden, Inc. v. Howard Trucking Co., Inc., 454 So.2d 1081 (La.1983).
Mr. Lerwick testified that he compiled his figures for projected lost sales and profits based on the sales he had experienced since the formation of his company approximately six months before the fire. He stated, "There is not a lot to lead me to believe that the following six months were going to be any better or any worse."
Plaintiff in this case has simply not borne his burden of proving his damages for lost profits to a reasonable certainity. There is no competent evidence in the record that Carribean ever lost a sale because of the fire. Mr. Lerwick testified that he had sold two of the pools that were destroyed in the fire, but his only evidence in support of his contention was a list compiled by him for trial purposes, and as such, it is not admissible as a business record. La.Civ.Code art. 2248 (prior to 1984 amendment). See Herlitz Construction Company v. Clegg Concrete, Inc., 378 So.2d 1002 (La.App. 1st Cir.1979). Mr. Lerwick attempted to support his contention of lost sales on chemicals and accessories by means of lists that were compiled by him for trial purposes, as verified by invoices from one of his suppliers. Third party invoices are not admissible as business records to establish damages unless their reliability is supported by the testimony of the third parties. Herlitz, 378 So.2d at 1006. There was no third party testimony in the instant case. Accordingly, we conclude that damages for lost profits are not allowable.
For the above and foregoing reasons, we reverse the judgment of the trial court as to the principal demand and find the defendant-appellee, George W. Bass, liable for the plaintiff's damages. We hereby award the plaintiff-appellant, Great American Surplus Lines Co., the sum of $66,749.83, plus legal interest from date of judicial demand, under their right of subrogation. This award represents their payment to Carribean less the $3,250.17 they received for salvage. We hereby award the plaintiff-appellant, Carribean Pools, Inc., the sum of $10,674.18, plus legal interest from date of judicial demand. We affirm the judgment of the trial court as to the reconventional demand. Costs of this appeal are to be borne by Mr. Bass.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
CARTER, J., dissents and will assign written reasons.
LANIER, J., dissents for the reasons assigned by CARTER, J.
CARTER and LANIER, Judges, dissenting.
CARTER, Judge.
We cannot join in the opinion of our learned brothers of the majority because of what we perceive to be factual and legal error therein.

LEGAL ERROR
The majority has erroneously interpreted and applied La.R.S. 9:3221 to the facts of the instant case. Specifically, the majority *795 fell into legal error by holding that, although Carribean as lessee contractually assumed responsibility for the wiring on its leased premises, nevertheless, Bass as lessor was still liable to Carribean for the mismatched circuit breakers and wires if he knew or should have known of these defects. The history of La.R.S. 9:3221 shows that the notice provisions contained therein are only applicable in cases between the owner-lessor and third persons; the notice provisions of the statute are not applicable to change the contractual relations between the owner-lessor and the lessee.
In Matt v. Cox, 478 So.2d 918, 920 (La. App. 1st Cir.1985), writ denied, 479 So.2d 913 (La.1985), appears the following:
Before the enactment of LSA-R.S. 9:3221 in 1932, there was no express provision allowing the lessor to shift some of his burden to the lessee, but courts allowed it by means of an agreement between the parties. See Clay v. Parsons, 144 La.985, 987, 81 So. 597, 597 (1919). Moreover, it is a basic principle of our law that parties to a contract may "renounce what the law has established in their favor, when the renunciation does not affect the rights of others, and is not contrary to the public good." LSA-C.C. art. 11. Consequently, parties to a lease have the right, as do parties to any contract, to broaden or restrict their respective rights and obligations that otherwise come about by operation of law. Shifting the burden of responsibility for the maintenance of the premises from the lessor to the lessee by their own agreement has never been considered against public policy. Furthermore, the French authorities, commenting on the French code article which is identical to our Civil Code article 2695, agreed that it was permissible for the lessor to stipulate that no warranty was made for vices or defects in the leased premises. 30 Dalloz.Rep.S. 196; 3 Duvergier 328, S. 345. Thus, when LS-R.S. 9:3221 was enacted, it was already the law that where a lessee assumed responsibility for the premises, he was contractually barred from recovering from the lessor for injuries. [Bolding added.]
The purpose of La.R.S. 9:3221 (Act 174 of 1932) was to legislatively overrule Klein v. Young, 163 La.59, 111 So. 495 (1926). In Green v. Southern Furniture Company, 94 So.2d 508, 511-512 (La.App. 1st Cir. 1957), appears the following:
However, these strict codal obligations of the owner-lessor as to the condition of the premises may validly be assumed by the tenant as a condition of the lease; and thereby will be barred the tenant's recovery for damage sustained through structural defects for which the owner would otherwise be responsible. Clay v. Parsons, 144 La.985, 81 So. 597; Pecararo v. Grover, Orleans, 5 La.App. 676. Likewise, the tenant could assume, as between himself and the owner, the latter's liability to third persons for personal and other injuries resulting from structural defects, Terrenova v. Feldner, La.App. Orleans, 28 So.2d 287, discussed in detail below.
But as squarely held by Klein v. Young, 1927, 163 La.59, 111 So. 495, although the lessee might validly assume such obligation as between himself and the owner-lessor, this assumption of liability by the tenant could not absolve the owner of responsibility to third persons injured through defects in the premises for which the owner was liable under the Civil Code, nor could it affect the rights of third persons to recover resultant damages from the owner. However, the effect of this Klein case was modified and largely overruled by the legislative enactment of Act 174 of 1932, discussed immediately hereafter, see, e.g., Paul v. Nolen, La.App. Orleans, 166 So. 509. [Bolding added.]
In the very excellent comment of B. Miller, Responsibility of Landlord and Tenant for Damages from Defects in Leased Premises, 20 La.L.Rev. 76, 87-88, 89 (1959), appears the following:
Effect of Lessee's Assumption on Third Persons
*796 The basic reason for adoption of R.S. 9:3221 seems to have been a legislative renunciation of the result of Klein v. Young, and other cases which allowed a third person injured as a result of defects in leased premises to maintain successfully an action against the owner notwithstanding the fact that the tenant had assumed all responsibility for vices in the property. It appears that the act was designed to lessen the owner's burden rather than to increase his responsibilities. Thus it would seem any change the act has effected pertains only to third persons, and eliminates recovery from the owner when the tenant has assumed responsibility with the exception of the notice provisions. Although it is apparent the drafters of the act desired to lessen the owner's burden, they apparently did not desire to go to extremes; thus they provided that the owner could be held liable to third persons if he knew or should have known of the defect.
. . . .
Effect of Assumption as to Tenant
It would appear the incorporation into the act of the notice provisions discussed above was intended to have effect only against third persons and not the tenant. Before adoption of the act, a lessee's assumption of responsibility for leased premises barred any subsequent cause of action that he might have had against his lessor for vices and defects in the property.79 No case was found that held the notice provisions of the statute applied to disputes between the tenant and the owner. 79 Clay v. Parsons, 144 La.985, 81 So. 597 (1919); Torres v. Starke, 132 La.1045, 62 So. 137 (1913); Pecararo v. Grover, 5 La.App. 676 (1927). See Taul v. Graffato, 13 Orl.App. 338 (1916).
[Bolding added.]
[Footnotes 71 and 72 omitted.]
The majority has applied the notice provisions of La.R.S. 9:3221 to alter a contractual agreement whereby the lessee (Carribean) obligated itself to the lessor (Bass) to maintain (repair) the electrical wiring on the leased premises. The history of La. R.S. 9:3221 indicates it was not intended to be applied in such a fashion. Under such an interpretation, contractual transfers of the obligation to maintain leased premises are meaningless between the lessor and lessee. Even if the lessee contractually assumes the obligation to maintain, under the majority interpretation of La.R.S. 9:3221, this obligation is transferred back to the lessor by actual or constructive notice of a defect. Further, under the majority interpretation, if the lessor thereafter fails to timely repair the defect (which the lessee contractually agreed to maintain) and the defect causes damage to the lessee, the lessor is liable to the lessee for the damage (even though the lessee contractually obligated himself to the lessor to maintain the defective thing).
In the absence of a controlling contractual agreement, La.C.C. art. 2716 provides that a lessee (tenant) is liable to make certain repairs to the leased premises. The jurisprudence interpreting La.C.C. art. 2716 holds that where the failure of the lessee to make such repairs causes injury to him, he cannot recover against the lessor. Stubbs v. Lee, 368 So.2d 1174 (La.App. 3rd Cir. 1979); Daniel v. Zurich Insurance Company, 184 So.2d 773 (La.App. 2nd Cir.1966). By analogy, it would seem that where the lessee contractually agrees to repair (maintain) the electrical wiring on the leased premises but fails to do so and the defective wiring then causes damage to him, he cannot recover from the lessor for damage caused by a defect he had a contractual obligation to repair. The lessee's failure to maintain (repair) is a breach of his contract with the lessor. How can the lessee's breach of his contract with the lessor be the fountainhead of recovery by the lessee against the lessor?

FACTUAL ERRORS
The majority opinion erroneously holds that Kim Burton, a person who did electrical work on the leased premises on several occasions, was an employee of lessor-owner, *797 George L. Bass individually. Citing this employer-employee relationship, the majority imputes Burton's knowledge of the electrical system on the leased premises to Bass individually to establish liability under La.R.S. 9:3221. The facts of record clearly show that Burton was not an employee of Bass individually, but was an employee of Bass Refrigeration and Marine Supply Company, Inc. (Bass Refrigeration). Bass Refrigeration is a separate legal entity from Bass individually. An employer-employee relationship did not exist between Bass and Burton, and such a relationship cannot be used to impute knowledge and/or liability.
There is no evidence of record to show actual or constructive knowledge of the mismatched circuit breakers and wiring by Bass individually. The original wiring of Bass' building was done by Bill Hedspeth, a licensed and bonded electrician. Because the Bass building was in the unincorporated portion of Terrebonne Parish, there was no governmental requirement that electrical work thereon be performed by a licensed electrician. When Carribean leased a portion of the building, that portion was rewired to suit Carribean's needs by Bass Refrigeration. This work was done primarily by Burton under the supervision of Lee C. Bergeron, Bass Refrigeration's manager. Neither Burton nor Bergeron was licensed, but both did electrical work by trade. Burton testified he rewired the Carribean premises in accordance with the National Electrical Code and did not mismatch the circuit breakers and the wires. Bergeron testified that after Burton did the rewiring he inspected the panel box and the proper circuit breakers were attached to the wires. No subsequent changes to those existing circuit breakers were made by Bass Refrigeration employees to his knowledge. Initially, Carribean had problems with the circuit breakers because of the air-conditioner compressor. The compressor was changed, and the problem was eliminated. Subsequently, after Carribean substantially increased production and employed additional men and electrical devices, the circuit breakers began tripping again. Burton checked the electrical circuits in the work area of Carribean's leased premises and determined that the electrical equipment being operated off of the existing electrical circuitry drew too many amps of current through the system and, thus, overloaded the system and caused the circuit breakers to trip. Burton did not inspect the system to see if improper circuit breakers were being used. Bergeron testified he gave Burton the proper wiring and circuit breakers to put in two new circuits for Carribean. Burton testified he installed these circuits two days before the fire.
There is no evidence of record that Carribean complained of improper circuit breakers to anyone or that Burton reported improper circuit breakers to Bergeron or Bass or that Bergeron reported improper circuit breakers to Bass. Bass testified he never looked at the circuit breaker panel prior to the fire and had no knowledge that the circuit breakers were improper. We perceive a substantial distinction between an overloaded circuit that trips a proper circuit breaker and an improper circuit breaker. We believe the majority opinion improperly equates the overloaded circuits found by Burton with the improper circuit breakers found after the fire. (The overload placed on the circuits by Carribean was indeed extreme because it tripped the improper circuit breakers.) In any event, there is no evidence of record to show actual or constructive notice to Bass of the existence of the improper circuit breakers (defect).
We agree with the majority that the trial court judge correctly found that the improper circuit breakers caused the fire that caused the damage to Bass individually, Carribean and Bass Refrigeration. The trial court judge, however, did not determine who installed the improper circuit breakers. (Thus, on this factual determination, we are not bound by the manifest error rule.) William E. Lerwick, Jr., Carribean's owner and president, denied any knowledge of the improper circuit breakers. Bass and Bass Refrigeration's employees, Burton and Bergeron also denied any knowledge of the *798 improper circuit breakers. On the face of the record before us, only Bass, Bass Refrigeration and Carribean had substantial access to the circuit breaker panel box, and so one of these is responsible for the error. There is no direct evidence to show who did it. After reviewing the entirety of the record, we believe a preponderance of the circumstantial evidence shows that Carribean is responsible for the error. This court should so hold and render judgment accordingly.
NOTES
[1] In regard to escaping liability under La.Civ. Code art. 2322, the defendants never claimed that the damage was caused by the fault of a third person or by an irresistible force.